CHARLES GLOVER, Respondent, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellant.

**Kansas City Court of Appeals, February 17, 1908.**

1. **PASSENGER CARRIERS: Ejecting Passenger: Insult: Damages.** A passenger who is in good faith ejected from a train on which he is entitled to ride may recover for all inconvenience, loss of time, labor and expense incurred by him in consequence of the wrongful act, but not damages for mental suffering nor humiliation nor by way of smart money; but where there is unnecessary violence or assault with abusive and insulting language, malice will be presumed and he is entitled to damages for his outraged feelings and humiliation and also by way of punishment.

2. ———: ———: ———: ———. The business of common carriers is with the general public and their agents and servants should be required to observe the rules of ordinary courtesy in dealing with patrons; and where they disregard this duty and in commission of tort add insult to injury, exemplary damages should be inflicted upon them, and the evidence in the record authorizes submission to the jury of the question of malice.

3. ———: ———: Damages: Instruction. An instruction relating to the measure of damages is condemned since it assumes the facts in dispute.

Appeal from Clinton Circuit Court.—*Hon. Alonzo D. Burnes,* Judge.

REVERSED AND REMANDED.

*Thomas R. Morrow* and *Samuel W. Moore* for appellant.

(1) Plaintiff was not entitled to recover any damages on account of alleged wounded feelings, humiliation or mortification in being required to leave the train at the time and place in question. Trigg v. Rail-

way, 74 Mo. 147; Connell v. Telegraph Co., 116 Mo. 34; Kellett v. Railway, 22 Mo. App. 356; Breen v. Transit Co., 102 Mo. App. 479; Grayson v. Transit Co., 100 Mo. App. 60; Snyder v. Railroad, 85 Mo. App. 495; Deming v. Railway, 80 Mo. App. 152; Strange v. Railway, 61 Mo. App. 1005; Rose v. Railroad, 106 N. C. 168, 11 S. E. 526; Railway v. Bennett, 50 Fed. 495; Railway v. Hawkins (Ky.), 89 S. W. 258; Gibson v. Railroad, 30 Fed. 904; Hall v. Railroad, 15 Fed. 57; Claybrook v. Railroad, 19 Mo. App. 425; Paine v. Railroad, 45 Iowa 569; Bradshaw v. Railroad, 135 Mass. 407; Townsend v. Railroad, 56 N. Y. 295.    (2)    Plaintiff was not entitled to recover exemplary or punitive damages in the case at bar.    Authorities under point 1; Boling v. Railroad, 189 Mo. 221; Logan v. Railroad, 77 Mo. 663; Orschen v. Scott, 90 Mo. App. 352; Clark v. Fairley, 30 Mo. App. 335; Kellett v. Railway, 22 Mo. App. 357; State to use v. Freese, 15 Mo. App. 591; Railway v. Bennett, 50 Fed. 496; Railway v. Hawkins (Ky.), 89 S. W. 258.    (3)    The court erred in giving plaintiff's instruction numbered 1.    Turner v. McBook, 77 Mo. App. 196; Sawyer v. Railroad, 37 Mo. 240; Barr v. City, 105 Mo. 559.    (4)    The court erred in giving plaintiff's instruction numbered 2.    Trigg v. Railway, 74 Mo. 142; Kellett v. Railway, 22 Mo. App. 357; Spohn v. Railway, 116 Mo. 617; Claybrook v. Railway, 19 Mo. App. 432; Snyder v. Railway, 85 Mo. App. 496.    (5) The court erred in giving plaintiff's instruction numbered 3.    Clark v. Fairley, 30 Mo. App. 335.

*W. S. Herndon* and *Hall & Hall* for respondent.

(1)    Plaintiff was entitled to recover damages for wounded feelings, humiliation and disgrace on account of the insulting and abusive language of the conductor, and by being accused of having stolen, forged or changed the ticket, or procured it by fraud and attempting to beat his way over defendant's railroad by means of the

ticket; and being struck, taken hold of and forced to leave the car like a culprit; and the court committed no error in giving plaintiff's instruction number 1, even under the rule laid down in the case of Trigg v. Railway, 74 Mo. 147, which is relied upon by the appellant. Grayson v. Transit Co., 100 Mo. App. 60; Trigg v. Railway, 74 Mo. 153; Hickey v. Welch, 91 Mo. App. 4; Breen v. Transit Co., 102 Mo. App. 489; McGinniss v. Railway, 21 Mo. App. 399; Cherry v. Railway, 52 Mo. App. 499; Railway v. Dyer (Tex. Civ. App.), 95 S. W. 12. (2) The evidence clearly authorized the court in giving plaintiff's instruction number 3, as to punitive damages, and it would have been error for it to have refused said instruction. Hickey v. Welch, 91 Mo. App. 9; Hicks v. Railway, 68 Mo. 337; Kennedy v. Railway, 36 Mo. 365; Malecek v. Railway, 57 Mo. 17; Evans v. Railway, 11 Mo. App. 474; Graham v. Railway, 66 Mo. 544; Grayson v. Transit Co., 100 Mo. App. 74; Ickenroth v. Transit Co., 100 Mo. App. 616; Haehl v. Railway, 119 Mo. 341; Railway v. Dobbins (Ark.), 95 S. W. 788; Williams v. Railway,    Mo. App.   ; 96 S. W. 307; Gardner v. Railway, 93 S. W. 917;      Mo. App.   . (4) The instructions taken as a whole, and construed together, properly declare the law of this case, and are as favorable to the appellant as the facts will warrant, or as it is entitled to, and if there were any defects in plaintiff's instructions they were cured by defendant's. Whalen v. Railroad, 60 Mo. 323; Crawford v. Doppler, 120 Mo. 362; Hat Co. v. Hombs, 127 Mo. 403; Spillane v. Railroad, 111 Mo. 564; Karle v. Railroad, 55 Mo. 482; Simons v. Ingraham, 78 Mo. App. 608; Wilburn v. Railroad, 36 Mo. App. 211; Reiley v. Railroad, 94 Mo. 611.

JOHNSON, J.—Plaintiff sued to recover both compensatory and punitive damages on account of the alleged wrongful act of defendant in ejecting him from one of its passenger trains. The jury returned a verdict in his favor for five hundred dollars actual and

five hundred dollars punitive damages and defendant, after ineffectually moving for a new trial, appealed from the judgment entered thereon.

On the 4th day of April, 1905, plaintiff purchased of the agent of the Chicago, Rock Island & Pacific Railway Company a "Homeseekers' Excursion" ticket which entitled him to transportation as a passenger from Trenton, Missouri, to Paul's Valley, Indian Territory, and return. The route stated in the ticket was over the line of the initial carrier to Kansas City and thence to Paul's Valley over defendant's railroad. Plaintiff began his journey on the day he bought the ticket. En route, he was told by the conductor of one of defendant's trains on which he was a passenger that to avoid going over a branch road, it would be necessary for him to get his ticket exchanged at Arkansas City, Kansas. When the train stopped at that place, he presented the ticket to defendant's agent who said it was "all right," issued him another ticket and returned to him the original. The new ticket was made out on a form which entitled the purchaser to a round trip from Arkansas City to Paul's Valley, but the agent, by use of a rubber stamp, changed the return trip coupon to read to Kansas City instead of Arkansas City and further stamped on the back of the ticket the words "Good to Kansas City account exchanged." Plaintiff completed his outward journey and just before starting to return complied with one of the stipulations printed on the ticket which required him to present it to defendant's agent at Paul's Valley for identification as the original purchaser. As one of the means of identification, he wrote his name on the back of the ticket in the presence of the agent who wrote his name as a witness to the signature and affixed the stamp of his office thereunder. The ticket thus validated was honored by defendant as far as Newton, Kansas, where there was a change of conductors. Shortly after the train left that

place, plaintiff offered the ticket to the conductor in charge who examined it, threw it on the seat with the declaration that he would not accept it and passed on. Afterward, he returned and the conversation which ensued is thus related by plaintiff.

"He came back after awhile and says 'if you will pay your fare to Kansas City, I will let you ride.' I says 'most anybody would do that.' He says 'you will have to pay your fare or get off, one or the other.' I showed him the other ticket . . . the one the Rock Island men gave me—they were both in one package. He says: 'I don't care anything about that at all. This is the ticket I am looking after. You will have to pay your fare or else get off.' . . . He never told me anything was the matter. He says, 'I won't take it,' and threw it on the seat and went on. . . . He says, 'well, if you will pay your fare maybe I can give it back to you at Kansas City.' I says, 'they told me that once before, but I never got anything back. I wrote to the general passenger agent and he never answered my letter for quite a while and finally he wrote that he would look into the matter and I never have heard from him since.' He says, 'well, if you don't pay it, I will put you off.'" Plaintiff then asked the conductor to carry him to Topeka where he had friends but the request was refused and when the train stopped at Peabody, the conductor said, " 'you get off here,' and he hit me on the shoulder and says, 'if I ain't man enough to put you off, I will get help and put you off.' That is what he said." Plaintiff further said the conductor acted in an angry and threatening manner, that he was a much larger man than plaintiff and appeared to be in earnest in the threat to use physical force to eject him. Under fear of violence plaintiff obeyed the order to leave the train and was preceded in his departure by the conductor and brakeman who carried out his hand baggage and deposited it on the station platform. Counsel for de-

fendant, on cross-examination, attempted to extort the admission from plaintiff that the conductor "merely tapped him on the shoulder" without any purpose of striking him, but plaintiff persisted in the assertion that the conductor did strike him in a way to indicate that more would follow if he refused to obey the order to leave the train. A passenger introduced as a witness by plaintiff testified in part: "The conductor asked him what he proposed to do about it. He said that he got the ticket regular and he proposed to ride on it. The conductor told him that if he insisted on that he would have to put him off. He told the conductor that he hardly thought he could do it. The conductor told him that he would call a brakeman to help him. Then he took hold of him, the conductor did, and Mr. Glover asked him to carry him to Topeka, as he had friends there and would be all right, and that he would go to headquarters and see about the ticket—or that they could. This the conductor refused to do, and insisted that he, with his belongings, would go off at the next station, and the conductor carried his stuff out. I think the brakeman helped him to take the stuff off, and the conductor did take hold of Mr. Glover and put him off." On cross-examination, the witness stated: "Q. The conductor never struck Mr. Glover, did he? A. No, sir. Q. You say he laid his hands on him? A. He took hold of him. . . . Q. What did he say when he took hold of his arm? A. He said he would put him off. Q. Did he get off then and there—just at that time? A. He did."

Other passengers, introduced as witnesses by defendant, testified that the manner of the conductor was not threatening or overbearing but that he was firm in his insistence that plaintiff was not entitled to ride on the ticket and must pay his fare or leave the train. One of these witnesses said: "He (the conductor) told plaintiff that the ticket had the appearance of having

been altered, and that he could not accept it for fare, and that plaintiff would have to pay his fare or get off the train, and if he did pay his fare, he would give him a receipt for the money, which the company would refund in case the ticket was all right. . . . I might say the passenger did not offer any resistance to the conductor in getting off and the conductor did not even lay his hands on him at the time he was getting off or at any time."

The conductor, on the witness stand, denied that he used any harsh or abusive language in his controversy with plaintiff and, on direct examination, said: "I asked him if he would not put up the four dollars and three cents (the fare to Topeka), that I wouldn't give him no receipt for it, or wouldn't cut a receipt for it, but I would hold the money until we got to Topeka. He declined that. I asked him to put up the collateral and explained to him that the company held me responsible and if I didn't get his fare or its equivalent it would be taken out of my salary. He stated that he had purchased the ticket in good faith and didn't care to pay the fare again, and I told him the company wouldn't want fare off of him twice. I asked him if he was stranded and he said no, but that he had had a similar transaction with the Santa Fe once before and they were so long reimbursing him that he didn't feel like doing it. . . . I told him if he wouldn't do anything towards securing me I would have to invite him off, and I think he told me I would have to throw him off. I told him it was useless to talk that way because if I couldn't put him off alone all I had to do was to call on bystanders and get help enough to put him off. Just about the time the train was stopping for Peabody I said: 'This is Peabody, you will have to get off here.' . . . My recollection is that I went out ahead of him. I think he had a grip of some kind and one of these picture frames, that is the structure of it, and I think

he carried that out. · I think I went out ahead of · him and set that on the platform. . . . He told me as we were about to start, he says to me, 'Mr. Conductor, the Santa Fe company will pay me for every minute I am laid out here.' I says, 'Friend, I am sorry, but I have done all I can do.' " We quote from the cross-examination as follows: "Q. You told him that he had to get off and you gathered his things and took them out and took hold of him to put him out? A. No, sir, I laid my hand on his shoulder and says 'come on.' Q. Did you take hold of him to put him off? A. Well, you can call it that if you want to. Q. Well, you are doing the calling. Didn't you take hold of him to put him out? A. Well, yes. Q. And you intended to do it? A. Yes, sir. Q. And you intended to use all necessary force? A. Yes, sir. . . . Q. (Referring to the ticket). Didn't you say also it had been obtained in some irregular manner? A. It had that appearance. . . . Q. Didn't you tell Mr. Glover right there that you was convinced the ticket had been found, stolen or bought, gotten by some way or other and that they went and got a rubber stamp and raised the ticket in the hopes of getting to Kansas City on that ticket? A. I believe I said that with the exception of the usual stamp, I did, because it showed that this ticket had been found, stolen or bought and they went and got these rubber stamps as anyone can, and went to work and fixed this ticket up with the hope of getting to Kansas City. I think I made that statement. Q. You said that to Mr. Glover in the presence of a car of strange people? · A. I don't know whether they were strangers or not. There was some people in the car. Q. You spoke to him about its being stolen or raised? A. Yes, sir."

After being put off the train, plaintiff remained at Peabody for about three hours and then boarded another passenger train for Kansas City. He offered the

ticket to the conductor who accepted it without objection. He arrived at Kansas City too late to connect with the Rock Island train for Trenton, was compelled to stay over night and incurred additional expense to the amount of about three dollars. The conductor of whose conduct plaintiff complains was retained in his position by defendant for about one month after the occurrence in question, when he was discharged for another cause.

It is plain that the trouble resulted over the alteration stamped on the ticket by defendant's agent at Arkansas City and that the conductor acted in good faith but under the false belief that the ticket had been stolen and altered by forgery. It is conceded by defendant that the ticket was valid, that plaintiff to whom it was issued should have been permitted to ride on it to Kansas City, and that he is entitled to recover the actual damage he sustained in consequence of his wrongful ejection. But it is argued that he should not be allowed compensation for his "wounded feelings, mental suffering, humiliation, shame and disgrace" nor punitive damages, and that the learned trial judge erred in including such damages in the instructions since the evidence most favorable to plaintiff fails to show either that the conductor used unnecessary force or violence in ejecting plaintiff from the train, or was guilty of insulting or abusive language or conduct.

In the solution of the questions thus presented, the principles of law by which we are to be guided are well settled in this State. Where a passenger who is wrongfully ejected from a train by the conductor sustains no physical injury in consequence thereof and the ejection is unaccompanied by unnecessary force or violence, wilfulness or malice, but is made in good faith under the mistaken belief of the conductor that the passenger is not entitled to ride on the train, the passenger may recover compensation for all the inconvenience, loss of

time, labor and expense incurred by him in consequence of the wrongful act, but he may not recover damages for mental suffering or humiliation, nor damages by way of smart money.    [Logan v. Railroad, 77 Mo. 663; Trigg v. Railway, 74 Mo. 148; Smith v. Railroad, 127 Mo. App. 53.] But where the conductor employs unnecessary force or violence to remove the passenger, or where he assaults him with abusive or insulting language, malice will be presumed and in such case the passenger is entitled to damages on account of his outraged feelings and humiliation and also may recover punitive damages.

We think the evidence adduced by plaintiff was of sufficient substance to take to the jury the issues of whether the conductor resorted to unnecessary physical force, and, further, was guilty of insulting language and conduct.    Defendant insists that in laying his hand on the shoulder of plaintiff, the conductor did nothing more than to commit a mere technical assault which, of itself, could not support a reasonable inference of malice, but this view is opposed to the testimony of plaintiff and, for present purposes, must be rejected. Plaintiff says the conductor hit him in anger with enough force to cause him to feel some pain and from all of the testimony on the subject it reasonably appears that the conductor laid his hand somewhat heavily on plaintiff as a means of enforcing instant obedience to his command.    The act introduced physical force into the discussion and by it a determination to employ greater force should plaintiff show any sign of resistance was manifested.    It may be likened to the act of a policeman who seizes a culprit by the arm in making an arrest.    Accompanied, as plaintiff says it was, by the appearance of official domination and truculence, it cannot be regarded in any other light than as an aggressive demonstration of physical force.    Its object of putting plaintiff in fear of personal violence is enough to

classify it as an actual as distinguished from a mere
technical assault.   That it was unnecessary is apparent
from the testimony of plaintiff.   It is true, witnesses for
defendant say that plaintiff intimated in what he said
to the conductor that physical force would be necessary
to remove him from the train, but plaintiff denies mak-
ing such statement and the triers of fact reasonably
could have drawn the inference from all of the testimony
that force was not necessary to the accomplishment of
the ejection.   To say the least, the conductor should
have given plaintiff the benefit of the doubt.   When the
train stopped, he should have afforded plaintiff a rea-
sonable opportunity to obey his command and should
have resorted to force only when it became apparent
that less coercive means would not suffice.   In this view
of the case, which as we have said the jury was entitled
to entertain, the act was excessive because unnecessary
and, being excessive, it supports a reasonable inference
of malice.

Further, we are of opinion that the charges made
by the conductor in the hearing of the nearby passengers
which assailed the honesty of plaintiff, were wholly un-
necessary and were insulting and humiliating.   We are
aware that the St. Louis Court of Appeals in Breen v.
Transit Co., 102 Mo. App. 479, held that insult could
not be inferred from the belief expressed by a conduc-
tor in the hearing of passengers that money offered by
a passenger in payment of his fare was counterfeit,
since a person innocently might have counterfeit money
in his possession, but the facts of that case differ in es-
sential particulars from those under consideration.
Here the ticket showed on its face it had been issued to
Charles Glover who alone was entitled to use it.   It
further showed that the original holder had presented
himself for identification at Paul's Valley; therefore,
when the conductor charged plaintiff with presenting
a ticket which had been stolen and then raised by for-

gery, he accused him of having acquired the ticket dishonestly. Could it be said that he did not directly charge plaintiff with having stolen and forged the ticket, it must be admitted he did accuse him of being another person than Charles Glover and with knowingly attempting to ride on a ticket to which he had no right and which he could use only by impersonating the rightful holder. In other words, he charged plaintiff with an attempt to perpetrate a fraud on defendant or, as plaintiff expressly puts it, of "deadbeating his way." Doubtless the conductor honestly thought from the irregularity on the face of the ticket such charges were well founded, but there was no occasion for him to say anything more than that he could not accept a ticket thus irregular. . The expression of his belief that it was stolen and had come to plaintiff's hand dishonestly was gratuitous and, as it proclaimed in the hearing of others a false accusation of dishonesty, it raised the issue of insult and abuse as one of fact for the jury. What we said recently in Knight v. Railway, 120 Mo. App. 311, is pertinent: "The business of common carriers is with the general public, and their agents and servants should be required to observe the rules of ordinary courtesy in dealing with patrons, and where they disregard this duty and in the commission of torts add insult to injury, exemplary damages should be inflicted upon them."

These considerations lead to the conclusion that the learned trial judge was right in the view that on the hypothesis that plaintiff had been ejected with unnecessary violence or had been subjected to insult and abuse, the jury should include in his damages compensation for wounded feelings and humiliation and might award him punitive damages.

But the judgment must be reversed and the cause remanded for the reason that the instruction on the measure of damages given at the instance of plaintiff embodies prejudicial error. It is as follows: "If the jury

find for plaintiff, in estimating his damages, you will take into consideration not only the actual loss sustained by plaintiff by reason of his expulsion from said train, but you will also take into consideration his wounded feelings and mental suffering and the humiliation, shame and disgrace caused him by being forced to leave said train in the presence of strangers and in a strange country, as well as all other facts and circumstances detailed in evidence, and you will assess his damages at such sum as you may believe from the evidence will be a full and fair compensation for all the injury he has sustained by reason of the wrongful acts of the defendant's said conductor in forcing him to leave said train, not exceeding, however, the sum of nine hundred dollars."

The fault of this instruction is that it assumes as proved the facts stated as a basis for the award of damages. These facts were the subject of controversy between the parties, were at issue before the jury, and it must be presumed that defendant was prejudiced by the statement in the instruction which, in effect, told the jury that they had been established in favor of the contention of plaintiff and that the error was not cured by the giving of proper instructions at the request of defendant. [Haynor v. Excelsior Springs Heat & Water Company, — Mo. App. — ; Wilkerson v. Eilers, 114 Mo. l. c. 252; Stone v. Hunt, 94 Mo. 475.]

Further, we find the court erred in permitting counsel for plaintiff, over the objection of defendant to refer in his opening statement to the jury to a subject about which the jury should not have been permitted to hear. But as the cause must be remanded for the error in the instruction just noted, we do not deem it necessary to say more than that a repetition of the offense should be avoided.

The judgment is reversed and the cause remanded. All concur.