ALMA R. WHITE, Respondent, v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, June 29, 1908.

1. PASSENGER CARRIERS: Ejecting Passenger: Punitive Damages. Where a passenger in good faith is wrongfully ejected from the train without physical injury or unnecessary force or violence, wilfulness or malice, he may recover compensation for inconvenience, loss of time, labor or expense incurred in consequence of the wrongful act, but not for mental suffering, humiliation or punitive damages.

2. ———: ———: ———: **Insult: Malice.** An accusation that the passenger was attempting to defraud the company, which is wholly unwarranted, is intentional insult and malice will be presumed therefrom; and a question of punitive damages was properly sent to the jury.

3. ———: ———: ———: **Evidence: Res Gestae.** After a passenger was ejected and returned to the car and paid his fare and also a second fare, he again became a passenger and was entitled to treatment as such; and the expressions of the conductor at the time of taking up the several fares, as also his remarks to the other passengers in regard to the incident, is proper evidence, since it is a wanton disregard of the passenger's rights and a part of the *res gestae.* [Cases distinguished.]

4. ———: ———: ———: ———: **Fact: Opinion.** Witnesses may describe the appearance and manner of speech of a conductor towards a passenger and characterize the same as "sneering" "angry" and his countenance and attitude as "threatening" or "contemptuous" as the case may be.

Appeal from Jackson Circuit Court.—*Hon. Robert B. Middlebrook,* Special Judge.

AFFIRMED.

*John H. Lucas, F. G. Johnson* and *C. S. Palmer* for appellant.

(1) The court erred in admitting evidence of the statements of the conductor after the alleged ejection. Barker v. Railway, 126 Mo. 143; Koenig v. Depot Co., 173 Mo. 721. (2) The court erred in admitting the opinions and impressions of witnesses. 7 Am. and Eng. Ency. of Law (1 Ed.), p. 472. (3) The punitive damages were excessive.

*C. C. Madison* for respondent.

(1) Everything said and done by the conductor during the entire controversy was an issue under the pleadings and was also a part of the *res gestae.* Shaefer v. Railway, 98 Mo. App. 445; Cunningham v. Railway, 79 Mo. App. 524; State v. Davidson, 44 Mo. App. 513; Construction Co. v. Railway, 71 Mo. App. 626. (2)

The language used by the witnesses in describing the conductor's manner was not improper or in any way harmful to appellant. State v. Buchler, 103 Mo. 203; Shaefer v. Railway, 98 Mo. App. 445; 5 Ency. of Evidence, K. 674 and B. 701; Reeves v. State, 96 Ala. 33, 2 So. 296; State v. Baldwin, 36 Kan. 1, 12 Pac. 318; Carroll v. State, 58 Am. Dec. 282; Powers v. State, 23 Tex. App. 42, 5 S. W. 153. (3) The question of punitive damages was for the jury to determine and the award in the case was fully justified by the evidence. Mueller v. Transit Co., 108 Mo. App. 325; Summerfield v. Transit Co., 108 Mo. App. 718; Gildersleeve v. Overstolz, 90 Mo. App. 518; Gardner v. Railway, 117 Mo. App. 138; McGinnis v. Railway, 21 Mo. App. 399.

JOHNSON, J.—Action by a passenger against a common carrier to recover compensatory and punitory damages for the wrongful ejection of the passenger which it is alleged, was accompanied by insulting and abusive language on the part of the conductor. Plaintiff had judgment in the sum of $1 actual and $250 exemplary damages and defendant appealed.

Material facts adduced by plaintiff are as follows: In the evening of the 9th of August, 1905, plaintiff, a young lawyer, accompanied by a young woman whom he was escorting to Independence, became a passenger on a north-bound street car on defendant's Troost avenue line in Kansas City, paid the regular fare and received transfer checks which entitled him and his companion to transfer to the Independence line at Eighth street and Troost avenue. In due time, they boarded an Independence car at this transfer point and plaintiff presented his checks to the conductor, who refused to accept them and demanded payment of fare. Referring to what occurred, plaintiff testified: "He (the conductor) looked at them and said, 'These transfers are not good.' I looked at them and said, 'What is wrong

with them?' and he said, 'They are not good.' I hesitated for a minute and said, 'What is wrong with them?' I examined them pretty thoroughly and saw that they were punched the proper date and the proper time. And he said, 'Those transfers are not good and you know they are not good. . . . You are one of those fellows who are all the time trying to beat their fare on the railroad, . . . And I said to him, 'I beg your pardon, those transfers were given to me by the conductor on the Troost avenue line and I don't see anything wrong with them, and I think I am entitled to explain the matter.' He said, 'They are not good and you are going to pay your fare or you are going to get off.' And I hesitated for a minute and I said, 'I will pay the young lady's fare, but you will have to put me off for I believe those transfers are good.' So I did pay her fare, and he grabbed me by the arm and pulled me up in the aisle, and he gave me a shove and pushed me some little distance, and then gave me another shove and I went to the back end of the car. And he said, 'Are you going to get off the car?' and I said, 'I am not,' and he then gave me a push between the shoulders in the back and pushed me on to the ground. He kind of sprained my back a little bit and here in the back of my neck (indicating) when he pushed me. And I started to get back on the car and he said 'You can't get back on this car unless you pay your fare,' and I said, 'I will pay my fare.' And I went into the car and sat down and he came up and said, 'Well, I put you off, didn't I?' and I said, 'Yes.' And I took a pencil—I asked the young lady who was with me if she had a pencil and she said, 'No,' and the conductor said, 'I will lend you a pencil if that is what you want,' and he did, and I took the names of some witnesses there and handed the pencil back to the conductor and thanked him and sat down. And that is about all that happened at that time until after we had

gotten out to Mt. Washington where they take up the
second fare to go to Independence, and he came along
and I handed him the fares and he said, 'You feel a
little better now, don't you?' and I said, 'I don't know
as I do.' . . . Q. What was his manner of speech?
A. It was sneering. (Objection. Overruled.) Q. Now,
from the beginning what was the conductor's manner
of speech? A. I don't know that I can explain his
manner of speech any more than the man's tone of
voice, expression and manner. That was his action and
that was the expression of all his remarks to me, in
that manner and that tone. Q. What manner and
tone? A. In a short, boisterous mode."

This statement is corroborated in substance by
other witnesses, one of whom, over the objection of de-
fendant, was permitted to state that some time after
plaintiff had been put off, paid his fare and resumed his
seat, the conductor remarked, "the more times he was
reported on a thing of that kind the better it suited him
and the company would stand for it." This witness
was asked to describe the manner of the conductor dur-
ing the altercation and afterward. We quote from his
examination on this subject: "Q. Can you imitate his
manner in any way? A. I am not a very good actor.
I can state what his manner was." Counsel for defend-
ant: I object to that. It is improper for the witness
to describe what he thinks about it.

The Court: Let the witness describe it the best
he can, as to how the conductor acted. Show the jury
the best you can the manner in which he acted and
what he had to say. Exception. A. I don't know as
I can do that. He was walking up and down the aisle
and made sneering remarks at different times. That
is as near as I can state. Counsel for defendant: I
object to that. Let him state what the remarks were,
and let the jury decide whether they were sneering.

The Court: I think the witness can state what he

had to say, and describe his manner, without saying to the jury outright that he was insulting or boisterous or giving any definition of his conduct. Defendant's counsel: I desire to have the record show that I object to the remark of the witness that the conductor was walking up and down the aisle making sneering remarks. I object to that as a conclusion of the witness and ask that it be stricken out and that the jury be instructed not to consider it.

The Court: That portion of the answer describing him as walking up and down the aisle will be allowed to stand, but that portion of the answer stating that the conductor was making sneering remarks is rejected. And the witness is instructed to tell what the remarks were that the conductor made when he was walking up and down the aisle. Q. What was his tone of voice, Dr. Thomas? A. One of the remarks was just what we were talking about awhile ago, when he said to me he didn't care how often he was reported on a matter of that kind; that the company would stand for it. And the gentleman returned his pencil, and he said in a tone of voice that I considered sneering and insulting, —Counsel for defendant: I think this witness ought to be censured; he is an intelligent man; and I move that the answer of the witness be stricken out.

The Court: That part is stricken out. . . . Q. Describe the language as near as you can. A. That was the language that I have just quoted, and I don't know of any way of giving his attitude except to express it; that is my idea.

"The Court: Let the witness go on and say whether it was in a loud tone of voice. A. It was in a medium tone of voice. It was neither very loud nor very low, but it was the manner in which he spoke it. Q. Can you describe to the jury the expression of his face and his attitude towards the plaintiff? A. His attitude was decidedly domineering. (Objection. No rul-

ing.) Q. What was the expression of his face? A. Of anger; an expression of anger."

It is alleged in the petition that the conductor, "in violation of plaintiff's rights as a passenger, declined to accept the said transfer check or to allow plaintiff to be carried upon said car; that the said conductor, although requested by plaintiff, refused to give any reason for declining to accept said transfer check, and in the presence of numerous passengers, falsely and maliciously charged plaintiff with knowingly trying to beat, cheat and defraud the company, and used violent and grossly insulting language toward plaintiff. That the said conductor forcibly ejected and expelled plaintiff from said car, and in so doing committed an assault and battery upon plaintiff by forcibly pulling him from his seat and pushing him off of the rear platform into the street; that said conductor thereafter continued the charge, in the presence of said passengers, that plaintiff had attempted to perpetrate a fraud upon defendant."

The evidence introduced by defendant is to the effect that the transfer checks offered by plaintiff had not been punched in the proper manner to entitle him to transfer to the Independence car at Eighth street and Troost avenue, and that the conductor employed but little force in ejecting plaintiff for the reason that plaintiff was willing to be put off under slight compulsion, and that the conductor did not use the insulting language ascribed to him by plaintiff and his witnesses. We find no evidence in the record to support an inference that the conductor acted in bad faith, i. e., that he refused to accept transfer checks which, at the time, he knew to be good. Recently, in Glover v. Railroad, 129 Mo. App. 563, 108 S. W. 105, we stated the well-recognized principle of law applicable to cases of this character: "Where a passenger who is wrongfully ejected from a train by the conductor sustains no physi-

cal injury in consequence thereof, and the ejection is unaccompanied by unnecessary force or violence, wilfulness, or malice, but is made in good faith, under the mistaken belief of the conductor that the passenger is not entitled to ride on the train, the passenger may recover compensation for all the inconvenience, loss of time, labor, and expense incurred by him in consequence of the wrongful act; but he may not recover damages for mental suffering or humiliation, nor damages by way of smart money.    [Logan v. Railroad, 77 Mo. 663; Trigg v. Railroad, 74 Mo. 148, 41 Am. Rep. 305; Smith v. Railroad, 127 Mo. App. 53, 106 S. W. 108.]    But where the conductor employs unnecessary force or violence to remove the passenger, or where he assaults him with abusive or insulting language, malice will be presumed, and in such case, the passenger is entitled to damages on account of his outraged feelings and humiliation, and also may recover punitive damages."

The evidence does not show that the conductor employed greater force than was necessary to eject plaintiff from the car, and the cause of action, as far as it relates to the infliction of punitory damages, rests solely on the charge that the conductor was insulting and abusive in his language and demeanor.    On the hypothesis, sustained by the proof offered by the plaintiff, that the transfer checks were properly issued and entitled plaintiff and his companion to become passengers on the Independence car, the evidence most favorable to plaintiff leaves no room to doubt that the conduct of the conductor was highly insulting and humiliating.    The accusation of plaintiff, in the presence of the other passengers of attempting to defraud the company was wholly unwarranted by the circumstances of the situation and can be regarded in no other light than that of intentional insult.    [Glover v. Railroad, supra.] Malice will be presumed from such conduct and the court acted properly in sending that issue to the jury.

It is argued that "The court erred in admitting
testimony of what the conductor said after the plaintiff
had returned to the car and paid his fare." The evi-
dence was admissible under the allegation of the peti-
tion "that said conductor thereafter continued the
charge, in the presence of said passengers, that plain-
tiff had attempted to perpetrate a fraud upon defend-
ant." The scope of the cause of action pleaded was
broad enough to include insults offered during the en-
tire period of transportation to Independence. The
cases cited by defendants do not support the view that
the offensive language and attitude of the conductor
following the payment of fare were not a part of the
res gestae. In Barker v. Railroad, 126 Mo. 143, after
the passenger had been put off and the train had left,
the conductor made a statement to a passenger who be-
came a witness in the cause and was permitted to tes-
tify to that statement over the objection of defendant.
Applying a plain and well-settled rule of evidence, the
Supreme Court held the evidence inadmissible. In
Koenig v. Railroad, 173 Mo. l. c. 721, the plaintiffs
"were permitted to prove by the witness Dashman over
the objection of defendant, that immediately after the
car came to a stop the motorman came back to where
the child was and in answer to this question by Dash-
man, 'Are you blind, to run over a child like that?'
he replied, 'I didn't see the child, I was looking at the
car coming east.'" The Supreme Court held: "What
the motorman said was a narration of a past event with
respect to which he was not authorized to speak for his
employer or master. His business was to control and
manage the cars of which he had care, and for whose
actions within the scope of his employment his employer
was answerable, but for nothing he said which did not
form a part of the accident, in other words, the res
gestae."

In the present case, when the conductor received

payment of fare from plaintiff, he accepted him as a passenger and thereby charged himself with the duty of treating plaintiff with respect and consideration. He had no right to continue his abuse and in so doing was guilty of a breach of duty. The controversy over the transfers had become a closed incident, it is true, but a new relation had been established, the obligations of which, the evidence under consideration shows the conductor wantonly disregarded. The gravamen of the cause pleaded was a breach of the contract of transportation which consisted, first, of a wrongful ejection accompanied by acts of malice and, second, of acts of malice committed after the conductor had accepted plaintiff as a passenger. Such being the posture of the case, it differs obviously in essential elements from those reviewed. The evidence clearly belonged to the *res gestae.* [Shaefer v. Railroad, 98 Mo. App. 445; Cunningham v. Railroad, 79 Mo. App. 524; State v. Davidson, 44 Mo. App. 513; Eagle Construction Co. v. Railroad, 71 Mo. App. 626.]

Further, it is contended that the court erred in permitting the witness from whose testimony we have copied to describe the appearance and manner of the conductor in his dispute with plaintiff, but we are of opinion that the learned trial judge unnecessarily restricted the scope of plaintiff's examination of the witness. In State v. Buchler, 103 Mo. 203, the prosecuting witness was asked: "Q. State what you discovered on defendant's countenance, if anything. A. The expression of his face was anger, ferocity, vulgar hate, the meanest look a mortal man's face could have." In deciding that this was not a mere expression of opinion but an evidentiary statement, the Supreme Court said, in part: "The general rule, it is true, is, that a witness must testify to facts, and the jury draw its conclusions from these facts. There are, however, manifestations, expressions and conditions which language,

at least of ordinary persons, cannot reproduce. Of such matters a witness is allowed to give the impression produced upon himself. This impression may be very near to an opinion. Thus a witness is allowed to testify that an object is red in order to distinguish it from other colors. This is nothing more than an impression produced upon his mind upon examination of the object, but he testifies about a subject, upon which common experience and knowledge have qualified him to speak; what facts could he state that would give the idea of red as the color of the object; of the same character is the expression of the countenance. A person of ordinary understanding could not detail facts which would give to a jury the remotest idea of the passions expressed on the countenance, though a child one year old would distinguish anger from love in its mother's face. Witnesses are allowed to testify to their impressions or opinions on such matters, for want of any other way to get the evidence before the jury; they admit of no more definite proof." Under these principles, it is competent for a witness to describe the appearance and manner of speech of a person of whose acts he testifies. The impossibility, or, at least, the insuperable difficulty to most people of portraying such appearances is sufficient reason for according probative value to the impressions produced on the mind of the witness. Repeating the language of the conductor could not disclose to the jury the sneer on his face or the truculence of his bearing. It was proper for the witness to say, if it were the fact, that the conductor spoke sneeringly or angrily and that his countenance and attitude bore a threatening or contemptuous aspect. [Fulton v. Railroad, 125 Mo. App. 239.]

Finally, it is urged that the punitive damages awarded by the jury are excessive. We do not think so, and perceive no reason for interfering with the judgment on that score.

The judgment is affirmed. All concur.