# *Pullman Palace Car Co. *v.* Gavin.

## (*Jackson.*   June 21, 1893.)

1. Sleeping-car Companies.

A sleeping-car company is not a common carrier or an inn-keeper. (*Post, pp. 56–58.*)

2. Same.   *Liability for porter's theft.*

The theft of the money of a passenger on a sleeping-car by a porter in charge of the car, renders the sleeping-car company liable therefor to the passenger.   (*Post, pp. 57, 58.*)

Cases cited: 124 N. Y., 58 (S. C., 21 Am. St. Rep., 644);  74 Texas, 654.

3. Same.   *Liable to custodian of passenger's money.*

A passenger who is intrusted with the money of another in his care for the journey, has such a right in the money that he can recover from a sleeping-car company by whose servant it is stolen.   (*Post, pp. 59–61.*)

Cases cited and approved: Criner *v.* Pike, 2 Head, 397; Logan *v.* Hartford City Coal Co., 9 Heis., 690;  42 N. Y., 326 (S. C., 1 Am. Rep., 527) ;  74 N. Y., 116.

---

FROM' SHELBY.

---

Appeal in error from Circuit Court of Shelby County.   L. H. Estes, J.

Thomas H. Jackson for Pullman Palace Car Co.

H. C. Warriner for Gavin.

---

* An elaborate and exhaustive note on the subject of liabilities as to passengers on sleeping-cars is published in 21 L. R. A., 289, in connection with the above case, and the case of *Mann Boudoir Car Co.* v. *Dupree.*—Reporter.

McALISTER, J.   The object of this suit is to recover the sum of $150 alleged to have been stolen from M: Gavin while a passenger on a Pullman palace car.

It appears from the record that on the night of the third of August, 1889, M. Gavin, with his immediate family and a few friends, left Memphis for a summer excursion. Among the party was Miss Kelly; and just before the train started, at 10 o'clock, Mrs. Kelly, the mother of Miss Kelly, who had accompanied her to the cars, handed to Gavin, across the aisle, the sum of one hundred and fifty dollars, to be used in defraying the expenses of her daughter during the trip. Gavin deposited the roll of money, without opening it, in his trousers pocket; and, when he retired to his berth, a lower one, about 11 o'clock, he felt the roll of money in his pocket. He then rolled up his trousers and placed them in the receptacle provided for clothes at the head of his berth. The next morning when Gavin awoke he felt for his trousers, and discovered that they were missing. Robinson, the colored porter, was called, and, in response to inquiries, told Gavin that he had found a pair of trousers on the floor that morning, but, supposing they belonged to the section adjoining the head of Gavin's berth, he had placed them in that section. This section was occupied by two well known and reputable citizens of Memphis. Robinson then brought the trousers to Gavin, but the money was missing. Gavin also discovered that

a bunch of keys was missing from his pocket, but he found therein a sleeve or collar button which was not his property. Robinson informed Gavin that the other porter, one Lind, had found a bunch of keys in the aisle during the night. Robinson then brought Lind to Gavin, and Lind handed him the bunch of keys, and also one or more baggage-checks. Gavin, upon discovering the loss of the money, had the conductor called, and reported his loss. The conductor made some search, but failed to find the money.

During the investigation, it was reported to Gavin that the porter, Lind, had lost one of his sleeve-buttons, and this fact, coupled with the finding of a strange sleeve-button in Gavin's trouser's pocket, at once fixed suspicion upon Lind. Gavin called Robinson and questioned him about the sleeve button, and was told by Robinson that Lind had asked him about his lost sleeve-button.

The car containing Gavin's party was occupied entirely by reputable citizens of Memphis, and many were also in the other sleepers. The train was a special train of five sleepers, and was to run from Memphis to Norfolk without change of cars, and all the sleepers were in charge of only one conductor. No new passengers came aboard at any place between Memphis and Chattanooga. The conductor testified, in regard to the feasibility of one passenger robbing another behind the curtain, that it is possible to be done, but not probable, if the porter is on watch and attending to

his duty. The record shows that Lind went on watch about twelve o'clock, and remained on watch until three o'clock, when he was relieved by Robinson, who then continued his watch until half-past six the same morning.

Robinson testified that if the porter was at his post and on watch, it would be impossible for any one passing along the aisle, or. for a passenger occupying an adjoining berth, to abstract any thing from Gavin's berth without attracting the porter's attention; that such a robbery was impossible without detection when the porter was on watch and doing his duty.

The porter, Lind, testified that no one passing along the aisle could have stolen any thing from a berth without being seen by him while on watch, but that a passenger in a berth might steal from an adjoining section at the head or foot.

The Circuit Judge tried the case without the intervention of a jury, and, being of opinion that the money was stolen by porter Lind, rendered judgment against the company for $150. The Pullman Palace Car Company appealed, and assigned errors.

The law is well settled that a sleeping-car company is not a common carrier. They differ radically in the kind of service rendered the public. The contract of the sleeping-car company is to lodge the passenger, while that of the carrier is to carry him. Sleeping-car companies are not liable as inn-keepers for the loss or theft of articles

from a guest, for the reason that the passenger on a sleeping-car retains the exclusive personal possession and control of his valuables. The company does not undertake to receive the property of the guest, but expressly declines to do so, and, for this reason, is absolved from the liability of an inn-keeper. It has been so difficult to define the precise legal status of this class of public servants, and the measure of their accountability, that they have been facetiously characterized as "flying nondescripts." It is, however, universally recognized by the Courts that it is the duty of a sleeping-car company to maintain a careful and continuous watch over the interior of the car while the berths are occupied by sleepers. If the property of the passenger is stolen by a fellow-passenger or by an intruder on the train, in consequence of the failure of the company to maintain this careful and continuous watch, the company will be liable for its value. *Carpenter* v. *N. Y. R. R.*, 124 New York, 58 (S. C., 21 Am. St. Rep., 644). It follows as a corollary from this proposition that, if the servant or agent of the company, charged with the duty of watching and protecting the property of the guest, purloins it himself, the company is responsible.

Says Mr. Wood, in his work on Master and Servant, Sec. 321: "In that class of cases where the master owes certain duties, either to third persons, or the public, whether the same arise from contract or statutory obligations, a different rule of

liability exists from that which prevails when the
liability sounds entirely in tort. When by con-
tract or statute the master is bound to do certain
things, if he intrusts the performance of that duty
to another, he becomes absolutely responsible for
the manner in which the duty is performed, pre-
cisely the same as though he himself had per-
formed it, and that without any reference to the
question whether the servant was authorized to do
the particular act. Where the master, by contract
or operation of law, is bound to do certain acts,
he cannot excuse himself from liability upon the
ground that he has committed that duty to an-
other, and that he never authorized such person
to do the particular act. Being bound to do the
act, if he does it by another, he is treated as
having done it himself, and the fact that his serv-
ant or agent acted contrary to his instructions,
without his consent, or even fraudulently, will not
excuse him." 74 Texas, 654.

The first assignment of error is, viz.: "There
is no evidence to support the finding of the Cir-
cuit Judge, for the reason that the evidence intro-
duced by the plaintiff, shows that the servants of
defendant were watchful and diligent, and were
guilty of no negligence." The Circuit Judge found
that the larceny was committed during Lind's watch
—between twelve and three o'clock—and he found,
further, that Lind was the guilty party. Upon an
examination of the record, we find material evi-
dence to sustain the finding of the Circuit Judge.

The second assignment is that the Circuit Judge erred in finding that the defendant, as a matter of law, was liable to the plaintiff for the loss of the money, for the reason that one passenger has no right to carry upon his person the money of another passenger, and to hold the defendant company liable for the loss.

The third assignment of error will be considered in connection with the second. The third assignment is, viz.: "The evidence shows that the money sued for was not the money of M. Gavin, but the money of Martin Kelly, who was not a passenger upon the car."

The gravamen of this suit is to recover the value of property claimed to have been stolen by the employes of the company who were charged with the duty of preserving it. As already stated, this money came into the hands of Mr. Gavin as a depositary, to be used and expended by him in defraying the traveling expenses of Miss Kelly. It has been held in this State that an actual and exclusive possession by a party, even though it be by a wrong-doer, is sufficient to support an action of trespass against a mere stranger or wrong-doer, who has neither title to the possession in himself, nor authority from the legal owner. *Criner* v. *Pike*, 2 Head, 397. Ordinarily, says the Court in that case, the party in possession is either the owner of the property or answerable over to the owner, and in either case he is entitled, not only to damages for the taking, but also for the value of the property.

This is the general rule. A defendant has been allowed to prove, in mitigation of damages, that the goods did not belong to the plaintiff, and that they have gone to the use of the true owner, either by being restored to him in specie, or taken upon legal process in payment of his debts, for in such case the plaintiff is not answerable over.

But Mr. Sedgwick thinks the principle of these decisions has been carried "quite far enough, * * * and that it will not do to permit acts of willful or wanton trespass to be excused by the defense of outstanding titles in third persons." See also *Logan* v. *Hartford City Coal Co.*, 9 Heis., 690, where it is held that "mere possession is a sufficient title upon which to maintain trespass against a mere wrong-doer." 7 Yer., 387.

Miss Kelly, having been placed in charge of Mr. Gavin, the latter had become the depositary of this money for the purpose of defraying her current expenses as they arose upon the journey.

It has been held that members of the same family, traveling together, may carry each other's effects. *Dexter* v. *Syracuse Railroad*, 42 N. Y., 326 (S. C., 1 Am. R., 527); *Curtis* v. *Delaware Railroad*, 74 N. Y., 116.

We think that Miss Kelly, having been placed in charge of Mr. Gavin, was, *pro hac vice*, for the purposes of the journey, a member of his family, and that a gentleman in charge of ladies on such an occasion was their protector, and the proper

custodian of their money and personal effects intrusted to him.

In this view of the case, we think it unnecessary to determine whether, at the time the theft was committed, the money was the property of Miss Kelly or her father, Martin Kelly. The proof shows the money was in the actual possession of Gavin, as its rightful depositary.

Other questions of minor importance were considered, and decided orally.

Affirmed.