## 16612. PULLMAN COMPANY *et al.* *v.* STRANG.

1. There was no merit in any of the special grounds of the demurrer to the petition.

2. A sleeping-car company is not a carrier of passengers. From the pleadings and the evidence one of the defendants appeared to be only a sleeping-car company, and the court erred, as to that defendant, in charging the jury to the effect that it was a common carrier and owed the plaintiff the duty of exercising extraordinary care and diligence for her safety. The court erred also in such instructions as submitted to the jury the question of whether that defendant was liable for injuries suffered by the plaintiff because she was not furnished a safe place to alight, or because of her having to walk to the station from the place of her disembarking over a rough and dangerous railroad-track.

3. But it does not follow from the above that the sleeping-car company was not shown to have violated any duty to the plaintiff whatever. It is the duty of such a company to notify a passenger riding in one of its cars of his or her arrival at destination, notwithstanding it is not a common carrier. A breach of such duty would be negligence, and a passenger aggrieved thereby would be entitled to recover nominal damages. The plaintiff was not entitled, however, to recover of the defendant sleeping-car company in this case such damages as the jury by their verdict awarded to her.

4. The evidence showing, without dispute, that the railway company required the plaintiff to alight at the particular place where she left the car, the court did not, as against that defendant, erroneously express an opinion on the facts when instructing the jury to determine "just where the plaintiff was required" "to alight or disembark." But the charge was inapplicable and erroneous as to the other defendant.

5. Where a married woman in a state of pregnancy suffers physical injuries which are caused by another's negligence, but which would not have resulted except for her delicate condition, she is not to be debarred from recovering damages from the person guilty of the negligence merely because her peculiar condition may not have been known to the other party.

6. The jury could have found, under the evidence, that the only discomfort which the plaintiff experienced by reason of the negligence complained of consisted of fright, nervous shock, or mental suffering. There was no evidence of wilful or wanton misconduct on the part of either of the defendants, the evidence showing merely a failure of duty. In such a case there can not, in this State, be a recovery for mere fright, nervous shock, or mental suffering. A portion of the court's charge could have been taken as stating a contrary rule, and was erroneous.

Appeal and Error, 4 C. J. p. 937, n. 6.

Carriers, 10 C. J. p. 828, n. 61; p. 839, n. 76; p. 844, n. 4; p. 853, n. 64; p. 1097, n. 40; p. 1168, n. 44; p. 1169, n. 47; p. 1172, n. 16; p. 1179, n. 99, 1; p. 1183, n. 21, 31; p. 1185, n. 61; p. 1186, n. 74; p. 1187, n. 79.

Damages, 17 C. J. p. 751, n. 32; p. 755, n. 63; p. 778, n. 70; p. 831, n. 54, 56; p. 832, n. 67; p. 838, n. 91, 93; p. 1066, n. 17; p. 1075, n. 3.

Pleading, 31 Cyc. p. 51, n. 71.

Trial, 38 Cyc. p. 1652, n. 86.

7. But the jury, on the other hand, would have been authorized, under the evidence, to allow damages for fright and also for accompanying physical injury, both as a result of the defendant's negligence. It was therefore not necessary to a recovery that the plaintiff should show that the defendant's conduct, causing the fright and injury, was wilful or wanton. Even "in the absence of wilfulness or wantonness, mere wrongful acts of negligence will authorize a recovery, where the resulting fright, shock, or mental suffering is attended with actual immediate physical injury," and in such case both the fright or mental suffering and the accompanying physical injury may be considered as elements of damage.

8. The evidence authorized the inference that the plaintiff suffered a hemorrhage as a consequence of the defendant's negligence, but not that she suffered the miscarriage as a result thereof. It follows that the charge of the court submitting to, the jury the first of these issues was not subject to the exception that it was unwarranted by the evidence; but a similar exception to a further charge submitting the cause of the miscarriage as a question of fact was well taken.

DECIDED FEBRUARY 16, 1926.

Damages; from Sumter superior court—W. M. Harper, judge pro hac vice. May 19, 1925.

Application for certiorari was made to the Supreme Court.

Mrs. Marie Strang brought a suit for damages against the Central of Georgia Railway Company and the Pullman Company. She alleged: that on the afternoon of November 26, 1923, she became a passenger upon the defendant railway company's train at a point in Florida, to be transported to Americus, Georgia, that on boarding the train she purchased the right to occupy a berth in one of the Pullman Company's sleeping cars, attached to the train, in which car she made her journey, and that the train was scheduled to arrive and did arrive at Americus at about three o'clock in the morning of November 27th. The agent and employee of the Pullman Company agreed, at her request, to notify her in ample time for her to make ready to alight on the arrival of the train at her destination, and also to notify her of such arrival. He complied with his promise to awaken her, and she got up and dressed and awaited notice that the train had reached the station. This further notice was not given her, however, by any agent of either company until she had been carried beyond the station for a distance of about a mile. The agent of the Pullman Company then called to her and said, "We are about to carry you by your station," and directed her to alight, with which direction she complied, not knowing at the time that the train had passed the station. As a result

she was compelled to walk, alone and in the nighttime, along the railroad track to the station at Americus. She was not familiar with the track and had no way to protect herself. The track was rough, in that the cross-ties were above the surface of the earth, and in that gravel was between the rails and the cross-ties, "all of which impeded the walking of petitioner . . and made walking therein and thereon difficult and dangerous." [She was directed to alight at a point where there were two lines of railroad-tracks and at a point where many trains passed. Between that point and the station there were many sidetracks, on which and on the main line a switch-engine was at work.] It was alleged that because of the negligence of the defendants "in putting her off said train at said place, she became frightened and nervous and sick, and that upon reaching the station at Americus she was yet sick, and continued to be sick for the remainder of her journey to Eufaula, Alabama, her ultimate point of destination, which she reached." The petition further alleged:

"10. Petitioner shows that as a result of said defendant's said negligence, she was confined to her bed for a period of six days at Eufaula, Alabama, and that at the time of her discharge from defendant's train she was in a delicate condition physically, a condition of gestation, and that on account of said defendant's negligence she suffered as a cause thereof a severe hemorrhage of the womb, resulting from her fright and from her long walk of about a mile as aforesaid down said line of track to said station, which caused petitioner great pain and suffering, both mental and physical, and that petitioner continues to suffer from the effects of said fright and long walk in mental and physical agony, all of which is the result of the defendant's wanton carelessness as aforesaid. And petitioner avers that on account of said defendant's gross and inexcusable negligence she suffered a miscarriage, which caused her great disappointment and mental and physical pain and agony, which was caused by said defendant's said act of negligence.

"11. Petitioner shows that up to the time of said defendant's said negligence she was a well, healthy, and able-bodied woman, but that since that time, due to defendant's negligence as aforesaid, she has become highly nervous and suffers great pain, all of which is the result of such miscarriage, which causes petitioner extreme anxiety about her well being, and has produced a general nervous and physical breakdown."

The petition, fairly construed, complains of negligence in the failure of the defendants to notify the plaintiff of her arrival at the station in Americus, in carrying her beyond the station and in causing her to alight at an unsafe and dangerous place, and in making it necessary for her to walk along an unsafe and dangerous route to the station. In paragraph 13 the plaintiff waived the "several contracts entered into between her and the defendants," and declared that her action was in tort, and claimed damages in the sum of $10,000. The Pullman Company filed no demurrer. A demurrer on general and special grounds was filed by the railway company, but the general grounds were not insisted upon. The special grounds of the demurrer were overruled, and exceptions were duly taken. Each defendant answered by a general denial. The case proceeded to trial, and the jury found in favor of the plaintiff $5,000. The defendants filed a joint motion for a new trial, which was overruled, and the defendants excepted. Other facts will be stated in the opinion.

*Dorsey, Brewster, Howell & Heyman, Mark Bolding, Stephen Pace, R. L. Maynard, H. A. Wilkinson,* for plaintiffs in error.

*James A. & John A. Fort, Terrell & Terrell,* contra.

BELL, J. (After stating the foregoing facts.) 1. Counsel for the railway company insist that the court erred in overruling its special demurrer to certain allegations in the petition, to the effect that the plaintiff had been under the care of physicians and was yet "under medical attention," but at the time of bringing her action was unable to allege the amount of her expenses by reason thereof, which she prayed leave to show later by amendment. By reference to the record it appears that the averments objected to were voluntarily stricken by the plaintiff, by a formal amendment which the court allowed. The demurrer therefore evidently accomplished its purpose, and it makes no difference what ruling the court made thereon.

One ground of the special demurrer objected to the averment of "wanton carelessness," in the 10th paragraph of the petition, as being a mere conclusion, unsupported by the alleged facts. The petition set forth in detail the particulars in which the plaintiff claimed the defendants were negligent, and it was therefore permissible to characterize the alleged default as wanton. "Mere conclusions of the pleader should of course be stricken, but it is

permissible to characterize the nature and effect of any given set of facts, after the facts are themselves fully stated." *Atlantic Coast Line R. Co.* v. *Thomas,* 14 *Ga. App.* 619 (1), 623 (82 S. E. 299). The allegations shown in the brackets in the above statement were made by one of the amendments to the petition, and were demurred to upon the grounds: (1) that they set forth a new cause of action; (2) that the facts stated therein had no relation to the case, since they were not alleged to be and could not be the proximate or a contributing cause of the alleged injury; (3) that it was not shown where the switch-engine was being operated in relation to the plaintiff or on which track. The plaintiff, by the allegations objected to, was undertaking to describe the place where she was caused to alight, and the route over which it was necessary for her to walk in order to reach the station. It was permissible for her to do this, and, since she averred that she was frightened and made sick and suffered physical injuries at the same time, she could also describe the surroundings as contributing to the general result. None of the other grounds of the special demurrer are insisted upon in this court. We see no error in any ruling of the court on the special demurrers.

2. In the motion for a new trial several portions of the court's charge to the jury are excepted to because they were predicated upon the theory that the Pullman Company was a carrier of passengers and owed to the plaintiff the duty of extraordinary care and diligence. It appears by the pleadings and the evidence that this defendant was engaged only in the business common and usual with sleeping-car companies, and it is held in practically all the decided cases that a sleeping-car company is not a common carrier of passengers. In Hughes *v.* Pullman Palace Car Co., 74 Fed. 499, the court said: "While it is true that the owners of sleeping cars as ordinarily operated on our railroads are not to be treated as common carriers with respect to their liability to patrons, it is especially true, from the nature and character of their business, in which they are brought into close and important relations, affecting the comfort and safety of a large class of the traveling public, they ought to be and must be held responsible for the discharge of certain general duties, involving the exercise of ordinary and reasonable care towards them. In many respects their responsibilities approach those of carriers, and while, by the

adjudicated cases, they are not made subject to the degree of care to which carriers are held, they certainly ought not be absolved from the general duty of treating their patrons with ordinary care and attention, whether the contract involved in a ticket sold by them prescribes it in terms or not. The adjudicated cases to which my attention has been called support the foregoing general proposition."

In Calhoun *v.* Pullman Palace Car Co., 159 Fed. 387 (1) (86 C. C. A. 387, 16 L. R. A. (N. S.) 575), the United States Circuit Court of Appeals of the sixth district said: "The railroad company is the carrier and is the party with whom the passenger contracts for his transportation. Among other things it contracts to supply him with the usual conveniences for his comfort while being transported. The parlor or sleeping-car company's business is to provide the passenger with certain conveniences and comforts which are in addition to those contracted for by the railroad company. Those duties to the passenger which are incident to the carrier's contract for transportation continue to rest upon the railroad company, notwithstanding he may have another contract with the sleeping-car company for special accommodations. . . The duties of the sleeping-car company to the passenger are coextensive with the nature of its contract. It does not undertake those which belong to the railroad company. . . It follows that the obligation of the sleeping-car company must be dependent upon the contract which the passenger is expected to have with the railroad company. And, since it has no control over that or its execution, it is not responsible for the manner in which it is carried out. These propositions express, as we think, the doctrine generally held upon this subject, and seem to be the logical relation of the law and facts. Duval *v.* Pullman's Palace Car Co., 62 Fed. 265 (10 C. C. A. 331, 33 L. R. A. 715, 23 U. S. App. 527); Paddock *v.* Atchison, T. & S. F. R. Co., 37 Fed. 841 (4 L. R. A. 231); Campbell *v.* Pullman Car Co., 42 Fed. 484; Pennsylvania Co. *v.* Roy, 102 U. S. 451 (26 L. ed. 141); The Express Cases, 117 U. S. 1 (6 Sup. Ct. 542, 628, 29 L. ed. 791); Chicago &c. R. Co. *v.* Pullman Car Co., 139 U. S. 79 (11 Sup. Ct. 490, 35 L. ed. 97)."

In Pullman Palace Car Co. *v.* Gavin, 93 Tenn. 53 (23 S. W. 70, 21 L. R. A. 298, 42 Am. St. R. 902), it was held: "The

law is well settled that a sleeping-car company is not a common carrier. They differ radically in the kind of service rendered the public. The contract of the sleeping-car company is to lodge the passenger, while that of the carrier is to carry him." See. also Pullman Co. *v.* Lutz, 154 Ala. 517 (45 So. 675, 14 L. R. A. (N. S.) 907, 129 Am. St. R. 67) ; Myers *v.* Pullman Co., 149 Ky. 776 (149 S. W. 1002, 41 L. R. A. (N. S.) 799). In 10 C. J. 1168 is the following: "Palace and sleeping-cars are operated in connection with railroad trains, generally by independent companies that make a business of the ownership and management of such cars, and the status of such a company, except where it is declared by a statutory or constitutional provision to be a common carrier, is not that of a common carrier of goods or of passengers, nor that of an innkeeper, although it bears some marked resemblance to each. Such a company, however, is a public servant, and its relation to the public imposes on it certain duties and liabilities in the carriage of passengers and their effects; and the State may impose on it reasonable regulations for the common good, subject to the constitutional limitations for the protection of rights to life, liberty, and property." This statement is abundantly supported by the authorities cited. In Allen *v.* Pullman's Palace Car Co., 191 U. S. 179 (24 S. Ct. 39, 48 L. ed. 134), the Supreme Court of the United States observed that "a sleeping-car is obviously a means of public transportation;" but this was not to hold that a sleeping-car company is a carrier of passengers, and we think the intimations by that court are rather to the effect that such a company is not a carrier. Pennsylvania Co. *v.* Roy, 102 U. S. 451 (26 L. ed. 141) ; Robinson *v.* B. & O. R. Co., 237 U. S. 84 (59 L. ed. 849, 35 Sup. Ct. 491).

The exact question has not been decided in this State, and counsel for the plaintiff contend that, whatever might have been the law previously, the relation of a sleeping-car company to a patron on an interstate journey is now fixed by the following provision of the amendment of June 29, 1906, to the interstate-commerce act: "The term, 'common carrier,' as used in this act, shall include express companies and sleeping-car companies." The principal objects of the original act "were to secure just and reasonable charges for transportation; to prohibit unjust discriminations in the rendition of like services under similar circum-

stances and conditions; to prevent undue or unreasonable preferences to persons, corporations, or localities; to inhibit greater compensation for a shorter than for a longer distance over the same line, and to abolish combinations for the pooling of freights." See Interstate Commerce Commission *v.* Baltimore &c. R. Co., 145 U. S. 263 (12 S. Ct. 844, 36 L. ed. 699). "Prior to the amendment of June 29, 1906, express companies were not specifically subject to the terms of the interstate-commerce act and the several amendments thereto, as common carriers." United States *v.* Wells-Fargo Express Co., 161 Fed. 606; affirmed in American Railway Express Co. *v.* U. S., 212 U. S. 522 (29 S. Ct. 315, 53 L. ed. 635). This language is equally applicable to sleeping-car companies, and it would seem that Congress has made these companies subject to the provisions of the act solely for the purposes thereof. Upon a consideration of the objects of the original act and the amendment, we do not think the above provision was intended to be determinative of the relation between sleeping-car companies and their patrons, or of the degree of care owing by such companies to their patrons. On the other hand, our opinion is that Congress merely undertook thereby to make these companies, for the purpose of regulation and control, subject to the jurisdiction of the interstate commerce commission and amenable to the other provisions of the act, and that our conclusion as to whether in the instant case the Pullman Company was a common carrier should be arrived at without reference to such provision. While in Pullman Company *v.* Custer, 140 S. W. 847, an action for an alleged wrongful ejection, which was decided in 1911 but in which no reference was made to the act of June 29, the Court of Civil Appeals of Texas said, "We think the relation of passenger and carrier arose between the parties by the sale to appellee and his friends of Pullman seat checks," it was further held in that case that "The question of whether or not the Pullman Company is a common carrier in the ordinary sense of the term is wholly immaterial, in so far as concerns the duty of its employees to treat its passengers courteously and considerately." It seems that the gist of the decision was that the sleeping-car company, while not technically a common carrier, must be held to its appropriate duties in its business with the public. Compare Pullman Palace Car Co. *v.* Lawrence, 74 Miss. 782 (22 So. 533). We have found

but one decision the language of which might appear to be at variance with our view with respect to the effect of the act of June 29, 1906, and that is in the case of Pullman Co. *v.* Linke, 203 Fed. 1017, decided by the Federal district court of the southern district of Ohio. But all that was necessary to be ruled upon the subject in that case was whether, under the existing facts, a car of the Pullman Company was an instrument of interstate commerce when seized under a State attachment. The company could have been engaged in interstate commerce without being a carrier, and could even have been so engaged independently of the provisions of such amendment. Being of the opinion that the act of June 29, 1906, does not affect the question for determination, we are constrained to hold, in accordance with the decided weight of authority, that the relation of passenger and carrier did not exist between the Pullman Company and the plaintiff in this case. Our ruling, therefore, is that the court erred in giving the instructions which stated expressly or impliedly that the Pullman Company was a carrier of passengers and owed to the plaintiff the duty of extraordinary diligence. The court erred also in submitting to the jury the question whether this defendant was liable for any injury suffered by the plaintiff because she was not furnished a safe place to alight, and because of her having to walk back to the station from the place of her disembarking, over a rough and dangerous railroad-track. *Mize* v. *Southern Ry. Co.,* 15 *Ga. App.* 265 (5) (82 S. E. 925).

3. But it does not follow from what we have said that the Pullman Company owed the plaintiff no duty whatsoever. It is the duty of a sleeping-car company, although it is not a common carrier, to notify a passenger of his or her arrival at destination. See Pullman Co. *v.* Lutz, 154 Ala. 517 (45 So. 675, 14 L. R. A. (N. S.) 907, 129 Am. St. R. 67). See also the note to that case in L. R. A. The allegations and the evidence sufficiently showed a violation of such duty by this company, and thus would have authorized a verdict against it for nominal damages. *G. S. & F. Ry. Co.* v. *Corry,* 149 *Ga.* 295 (99 S. E. 881) ; *Southern Ry. Co.* v. *Cartledge,* 10 *Ga. App.* 523 (1) (73 S. E. 703) ; *Williamson* v. *Central of Ga. Ry. Co.,* 127 *Ga.* 125 (3), 131 (56 S. E. 119) ; *Jeter* v. *Davis,* 33 *Ga. App.* 733 (3), 740 (127 S. E. 898). There was evidence to the effect that, although the train did stop

at or near the station, the plaintiff was given no notice of the fact, and was not notified until she had been carried a considerable distance beyond. The plaintiff was not, however, entitled to recover of the defendant such damages as the jury by their verdict awarded to her. It could not be said that the discomforts and injuries which she may have sustained by reason of the negligence of the railway company in the further happenings were the natural and proximate result of the failure of the Pullman Company to notify the plaintiff of her arrival at her destination. Any default by the railway company was a separate and independent agency, the operation of which the Pullman Company could not be held to have foreseen and anticipated as a result of its own negligence. The expectation should have been that the railway company would discharge its own duty and see that the plaintiff arrived at her destination without injury, notwithstanding the breach of the duty by the Pullman Company. See *G. S. & F. Ry. Co.* v. *Corry,* supra. If it had appeared that the neglect by the Pullman Company induced some *non-negligent* act of the other defendant, it might perhaps have been liable for the consequences of such subsequent act, but that question is not presented for decision. It was the duty of the railway company as well as of the Pullman Company to announce the plaintiff's station; and the duties of the two companies in this respect, while concurrent in time, were otherwise separate and distinct, and the subsequent omissions of the railway company relate back not to the failure of the Pullman Company to announce the station, but to its own failure to do so. Our conclusion in this connection does not contravene the rule that a person who is grossly negligent himself has no right to count on proper diligence by others, to whom his negligence may result in injury. *Davis* v. *Whitcomb,* 30 *Ga. App.* 497 (8) (118 S. E. 488).

Even if we are incorrect in holding in the preceding division of this opinion that the Pullman Company was not a carrier of passengers, its only negligence was its failure to announce the station, because in neither view was it the duty of that company to provide the plaintiff with a safe and proper place to alight, or with a safe way of egress from the train to the station. These matters, under the ruling in *Mize* v. *Southern Ry. Co.,* supra, were solely within the responsibilities of the railway company. In that case this court, speaking through Judge Wade, said: "Where a passenger

of the Southern Railway Company purchased a ticket of the Pullman Company entitling her to ride in a Pullman car, which was a part of the train in which she was a passenger over the line of the railway company, and, on reaching her destination after dark, was 'ordered to alight from said car' by 'the person who had charge of said car,' and did alight at an unusual, unsafe, and dangerous place (the train having stopped short of the station), and thereby suffered injuries, her right of action, if any, was against the railway company, and not against the Pullman Company."

4.  Both defendants complained that the court erroneously expressed an opinion on the facts in instructing the jury as follows: "The question of fact for you to determine and say is where the plaintiff was required, by the agents of these defendants, to alight or disembark from the car in which she was riding on that occasion." They contend that it was issuable, under the evidence, as to whether the plaintiff was *required* to disembark at any place. And it is insisted also on the part of the Pullman Company that the instructions were inapplicable because that defendant was not a common carrier. From what is said above, we think the charge was error as to the Pullman Company. But, as to the other defendant, the evidence was undisputed that the first notice which the plaintiff had of having reached her destination was when the train was about to stop a considerable distance beyond; and that, at the invitation of the porter on the sleeping-car, she alighted as soon as the train stopped, but that she did not know until she had disembarked that she was not alighting at a proper place. It thus appears that she was offered no choice as to the place of disembarking, and that she did not voluntarily get off at an unsuitable place. The railway company was bound by the conduct of the porter as if he had been its actual agent and employee. *G. S. & F. Ry. Co.* v. *Corry,* supra; Robinson *v.* B. & O. R. Co., 237 U. S. 82 (35 S. Ct. 491, 59 L. ed. 849). It seems, therefore, to have been established without controversy that the railway company did require the plaintiff to alight at the particular place. It is not error for the trial judge to express an opinion as to a fact which is established by the evidence without dispute. *Flowers* v. *Faughnan,* 31 *Ga. App.* 364 (2) (120 S. E. 670).

5.  What we shall say hereafter would be applicable to both defendants alike, except for the fact that we have already referred to

the only default which could be chargeable to the Pullman Company, and have ruled sufficiently on the contentions of that defendant. In the following discussion, therefore, we shall deal with the case as if the railway company were the only party complaining. It is contended that in no event was the plaintiff entitled to recover for injuries resulting from the defendant's negligence by reason of her condition of pregnancy, because the defendant had no knowledge or notice of such condition. As to whether this contention might be well founded, if it appeared that the plaintiff's physical injury and suffering were merely the *result* of fright, it is unnecessary in this case to decide. See *Goddard* v. *Watters,* 14 *Ga. App.* 722 (82 S. E. 304) ; *Pettett* v. *Thompson,* 33 *Ga. App.* 240 (25 S. E. 779) ; *Williamson* v. *Central of Ga. Ry. Co.,* supra. Her evidence supported the allegations of negligence, including the averment as to the unsafe and dangerous character of the railway-track. She testified that in walking back to the station she stumbled several times and became sick, and the jury could have found that on account of her delicate condition some physical injury proximately resulted to her directly from the defendant's negligence. The case is not one wherein the plaintiff seeks to recover for physical injury *resulting from* fright, but is one where the evidence would have authorized the conclusion that the fright was *attended with* physical injury, both being the direct result of the defendant's negligence. The physical injury did not necessarily depend upon the plaintiff's excitement. The jury could have found that her nervousness and fright constituted an element of damage additional to, rather than causing, the physical injury alleged. The plaintiff, therefore, was not to be debarred from a recovery merely because the defendant did not know of her delicate condition. See *Augusta &c. R. Co.* v. *Randall,* 79 *Ga.* 304 (6) (4 S. E. 674) ; *Georgia R. & B. Co.* v. *Usry,* 82 *Ga.* 54 (2) (8 S. E. 186, 14 Am. St. Rep. 140). In Mann Boudoir Car Co. *v.* Dupre, 54 Fed. 646 (21 L. R. A. 289), the United States circuit court for the southern district of Mississippi, with reference to a contention identical with that now under consideration, said : "This theory, and the requested charge embodying it, would require every pregnant woman to refrain from travel; to take all the risks of the negligence of public carriers; or to proclaim her condition to the servants of the carriers. We are not willing to sanction by our

authority a rule that would so shock the delicacy, dignity, and sense of justice of our 'honorable women not a few.' The subject called for careful direction of the jury in order to exclude damages too remote; that is, such as were suffered from the action of some intervening cause, or contributed to by the negligence of the plaintiff below. Where, however, the proof satisfactorily shows that the misconduct of the carrier's servant to her while she was a passenger in the carrier's car was the proximate cause of such an injury to a married woman, the carrier should not be held exempt from liability on account of the fact that her condition was unknown to the servants of the company."

We have been content to forego a search for other authorities upon the point.

6. While, as we have said, the jury might have done so, they were not bound to find, under the evidence, that the plaintiff suffered any physical injury whatever as a result of the defendant's negligence. They could have found that the only discomfort which she experienced by reason thereof consisted of fright, nervousness, or excitement. With reference to the defendant's conduct, the evidence shows nothing more than a failure of duty, and this alone could not have amounted to wilfulness or wantonness. *Southern Ry. Co.* v. *Bryant,* 105 *Ga.* 316 (1) (31 S. E. 182) ; *Southern Ry. Co.* v. *Davis,* 132 *Ga.* 812 (3) (65 S. E. 131). And in this State a recovery can not be had solely for fright, nervous shock, or mental suffering, caused by mere negligence. *Green* v. *So. Ry. Co.,* 9 *Ga. App.* 751 (72 S. E. 190) ; *Chapman* v. *W. U. Tel. Co.,* 88 *Ga.* 763 (15 S. E. 901, 17 L. R. A. 430, 30 Am. St. Rep. 183). The excerpt from the charge of the court excepted to in ground 14 of the motion for a new trial could have been misunderstood as stating a contrary rule. This excerpt was as follows: "On the other hand, if you should believe that after the train in question had reached Americus, Ga., that this plaintiff was carried beyond the station, and was required by the employees of the defendants to disembark at an unsafe and dangerous place, and that by reason of having been required to disembark at an unsafe and dangerous place, and at an unusual distance, if you believe it was an unusual distance, from this station, that the plaintiff, as a result of having been required to so disembark, became frightened, and excited, and nervous, and if you should believe that any damage resulted to

her such as the law contemplates should be recovered by her, about which I will charge you, then, of course, if you believe that to be the facts of this case, the plaintiff would be entitled to recover such damages as the law contemplates recoverable under conditions of that kind." No question of physical injury was referred to, and we are of the opinion that the charge was error. And this is true notwithstanding the court in a subsequent portion of the charge told the jury that if the plaintiff suffered no physical injury, she would be entitled to recover nominal damages only. The latter instruction did not immediately follow the other, but was given remotely therefrom, and the jury did not likely understand it as a modification of the instruction complained of. Furthermore, it did not instruct the jury that for mere negligence there could be no recovery for fright alone. If the plaintiff had been entitled to recover nominal damages only, such right would have accrued simply because of the defendant's negligence, and not because of fright. A similar attack is made upon other extracts from the court's charge, all of which we have carefully examined. In the respect indicated we find that error as assigned was committed only in the excerpt first referred to in this division.

7. A further contention of counsel is that the plaintiff was not entitled to recover substantial damages, because the only physical injuries shown either by the pleadings or the evidence to have been suffered by her appear to have resulted from fright, and that in such a case no recovery could be had in the absence of wilful and wanton negligence, which the jury could not have found to exist in this case. We can not agree with this contention, for the reason that, as already stated, we think the evidence would have *authorized* a finding that the plaintiff suffered not only fright, but also attendant physical injury, both as a result of the defendant's negligence. Such being the case, the jury would have allowed damages both for the fright and the injury, irrespective of the absence of evidence to show that the defendant's conduct was wilful or wanton. *Hines* v. *Evans,* 25 *Ga. App.* 829 (1) (105 S. E. 59). Whether it would have been necessary for the plaintiff to show wilfulness and wantonness in order to recover for physical or mental impairment *resulting from fright,* as distinguished from such impairment accompanying fright, where that and the fright both resulted from the defendant's negligence, is another question which it is unnecessary to decide in the present case.

8. "It is one of the duties of a railway company carrying passengers, in order to afford them an opportunity to leave the train at the station of their destination, to have the name of such station announced upon the arrival of the train." *G. S. & F. Ry. Co.* v. *Corry,* supra. Where the relation of carrier and passenger is once established, it would ordinarily continue until the passenger is safely deposited at his point of destination, and until he has left or has had a reasonable opportunity to leave the premises of the carrier. *Brunswick &c. R. Co.* v. *Moore,* 101 *Ga.* 684 (28 S. E. 1000) ; *Georgia R. & B. Co.* v. *Brooks,* 30 *Ga. App.* 692 (3) (119 S. E. 424). Where the train passes the station or the usual place for passengers to alight, and the carrier requires a passenger to alight in an unusual and unsafe place, it would be liable for resulting injury. *Mize* v. *Southern Ry. Co.,* supra. The evidence sufficiently showed that the railway company was negligent as alleged. The questions now for determination are, was there any evidence to show that such negligence was the cause of the plaintiff's hemorrhage, and, even if so, was such causal connection also established as to her miscarriage? The trial judge charged the jury, in effect, that if they found that the defendant was negligent, and that such negligence "was the proximate cause of the subsequent hemorrhage and the subsequent miscarriage or abortion, if the same ensued," then they would be authorized "to allow damages within the measure as contemplated by law for such injury." He further charged the jury, in substance, that if they found that the defendant's negligence, if any, produced the hemorrhage, but should not believe that it produced the miscarriage, they would allow damages "for just such injury" as the plaintiff suffered as a result of the defendant's negligence. The defendant, in its motion for a new trial, excepted to these charges upon the ground that they were unwarranted by any evidence in the case, thus raising the questions referred to above. We think the evidence authorized the court to submit to the jury the question of whether the plaintiff's hemorrhage was caused by the defendant's negligence, but not whether her miscarriage was caused thereby. The transactions wherein the defendant is alleged to have been negligent occurred at about three o'clock in the morning of November 27. About three weeks previously thereto the plaintiff went with her husband in an automobile from her home in Columbus, Georgia, to

Miami, Florida, a distance of about seven hundred miles, as shown
by the evidence, making the trip in six days, traveling a part of
each day.    She remained in Miami· about eight days and "rode
around Miami some in an automobile.    In returning from Miami,
she traveled by railroad as far as Daytona, where she was met by
her husband, who brought her by automobile to Gainesville, Flor-
ida, a distance of more than fifty miles.    She went immediately
thence to Jacksonville by railroad and, after remaining there a few
hours, boarded the defendant's train in the evening of Novem-
ber 26 for Americus.    She was in Americus about two hours
and a half, and went from there, on another of defendant's
trains, to Eufaula, Alabama, arriving at 8:35 a. m. on Novem-
ber 27.    After staying a week or so in Eufaula she returned
in an automobile to her home in Columbus, the distance being ap-
proximately sixty miles.    A day or two thereafter she went from
her home to Atlanta, a distance of more than one hundred miles,
this trip also being made in an automobile.    She went there to
consult a physician.    She returned to Columbus on a train.    She
went to Atlanta again in an automobile, for the same purpose, on
January 2.    She testified that the physician in Atlanta examined
her, but did not treat her or prescribe for her.    Her miscarriage
occurred on January 8, after her return from the second trip to
Atlanta.    Her first hemorrhage occurred in Eufaula on November
28, in the early part of the morning.˙    This, however, subsided in
"a day or two."    She was acquainted with a physician in Eufaula,
who had been "her family physician."    She testified that she did
not consult a physician in Eufaula, because she was a trained nurse
and knew and did what a doctor would do.    She did not consult
any physician except the one in Atlanta, until January 7, the day
before her miscarriage, when she was seen and examined by a Doc-
tor Murray of Columbus.    The causes of miscarriages and preven-
tive treatment were fully explained to her during her study and
training for the profession of a trained nurse.    As bearing further
upon the happenings in Americus and upon her condition and con-
duct previously and subsequently, she testified as follows:    "The
railroad-track between the place where I was put off and the sta-
tion was quite rough.    It caused me to stumble in walking, I
stumbled often.    .    .    I walked part of the way and ran part of
the way.    .    .    I was frightened, and I was very nervous by the

time I reached the station. . . When I finally arrived at the station I was quite nervous and upset over it, . . when I arrived at Eufaula really ill. I was ill for about a week. . . At the time I was directed to leave the train as I described I was pregnant. The length of time was about six weeks. The day after I arrived at Eufaula I had some bleeding. The duration of the bleeding was only for a day or two. That did not cause as much pain and suffering as alarm as to what it might bring forth. From that time on I felt the effects of this experience I had undergone. During the month of December, 1923, I was not at all well, as I said, and very, very nervous. . . I did not do anything in the way of lifting heavy burdens or taking violent exercise of any kind. I lived a quiet life and stayed in the house a great deal. I was not doing anything at all strenuous. Subsequent to November 28, 1923, nothing occurred to me to cause me any violent excitement of any sort or to cause me to strain myself in any way physically. . . I did not ride around in Eufaula. I did not walk except a few steps around the house. I did not stay in bed all the time I was in Eufaula. There was just one hemorrhage. I went to bed and spent the greater part of the time in bed. I was in bed part of the time; in the middle of the day rested a lot; sat in the living room and went to the dining room to dinner. I walked around the house very little. I went back and forth to my dinner, and then went back to bed in the afternoons. I did not go out of the house at all during those eight days while I was in Eufaula. . . I did not walk any in Columbus except around the house. I was not confined to my room in Columbus. I didn't go anywhere, but I walked around the house. . . My health was good up until the night I was put off the train beyond Americus. Since that time my health has not been as good as it was. On my automobile rides to Florida and elsewhere I did not receive any fright or jar or fall or anything of that sort."

The only physician who testified was Dr. W. S. Prather, who did not examine or treat the plaintiff. In answer to a hypothetical question describing what had happened to the plaintiff in Americus and asking if a miscarriage would probably result, he testified: "Well, it possibly could produce that result." While he testified at length, he at no time testified more definitely in the plaintiff's favor. A further question was propounded as follows: "Doctor,

if a person, as I have detailed, just an imaginary upon [one?] such as I have suggested, had gone through the experience I have enumerated; and that person was pregnant at the time; and a miscarriage followed; and it further appearing that there had been no jar, or jolt, or any other thing or excitement, or any exertion on the part of that person; if that appeared and a miscarriage occurred, would you then say that the miscarriage was the natural and probable result of the experience that I have just related?"

The witness answered: "If there was no other cause at all and this thing happened, and we got hold of everything on the subject, and couldn't ascribe it to anything else, it probably would be the existing [exciting?] cause of the beginning of a miscarriage." It was the opinion of this witness that "to ride in an automobile a long distance would be much worse than in a Pullman car on the modern trains we now have," and that "a shaking about, a jolting of the body, a shake of any kind, or strain, or any kind of nervous irritation would be a cause of an abortion; that could produce it." To quote from his testimony further: "A hemorrhage is really the first symptom they usually have. I would say that where a hemorrhage has occurred, that could be the forerunner of what I call a threatened abortion. In a case where a lady had a threatened abortion by a slight hemorrhage, in that condition it would be a pretty good idea for her to call a physician. It would be necessary for her to call a physician, if there was much hemorrhage. As to what is necessary in a case of hemorrhage of that kind in the way of treatment, in order to prevent the threatened miscarriage or abortion being brought about, the first thing to do is to put them to bed and keep them there several days. It would be necessary for a woman, if she had that threatened abortion, to stay in bed for several days until the symptoms of the hemorrhage had disappeared, and she had no pain or soreness in the abdomen. And even if that took a month or longer, it would be necessary for her to remain in bed, if gestation was to continue; pregnancy was to continue. To say the least of it, it would be a very imprudent thing to do, instead of her going to bed, for a woman to walk around the room, to be in bed part of the time and on her feet part of the time." Question: "Supposing that within four or five days after this hemorrhage, this woman got in a car and traveled from Eufaula, Alabama, to Columbus, Georgia?" Answer: "I would

expect as a probable result of that kind of a trip the symptoms to
return. In that case I would probably expect a return of it; of
course, it don't do it every time, but that would be a probable thing
to suspect. I would not advise a woman in that condition to ride
that far in an automobile. I really think it would be a dangerous
thing for her to do; that's the reason I said I wouldn't advise it."
Question: "From Eufaula, Alabama, to Columbus, Georgia, must
be more than a hundred miles. Supposing that it's anywhere from
fifty to a hundred miles, it wouldn't be a very good thing for her
to do, to ride that far in an automobile?" Answer: "I expect it
would be about the worst thing she could do. And I wouldn't be
surprised, where a thing like that happened, to see a miscarriage
or abortion brought about as a result of that." Question: "In ad-
dition to that, if after remaining in Columbus for a day the same
woman that we are talking about should get in a car and go to
Atlanta, a distance of a hundred miles, after taking the trip from
Eufaula to Columbus?" Answer: "I would expect, as a result of
that, it would add to the risk already incurred." Question: "Sup-
posing she stayed in Atlanta two or three days, was on her feet
part of the time, part of the time riding, part of the time in a
hotel, that then she got on the train and went back to Columbus,
—supposing that took place about a week after the trip from
Eufaula, and then, supposing that about a month after that the
same woman should take another trip from Columbus to Atlanta,
a distance of one hundred miles, and then take a trip from Atlanta
back to Columbus, a distance of a hundred miles in an automobile,
Buick car?" Answer: "It looks like only probable after having
a threatened abortion, it would certainly occur as a result of that."

The above statement embraces the substance of all the evidence
in the record as to the proximate cause of any of the plaintiff's
pains or injuries. Considering the plaintiff's evidence as to her
conduct and feelings previously to and immediately after the de-
fendant's alleged negligence, including the statement that she
stumbled several times in walking along the railway-track, and the
physician's testimony that "a shock of any kind" would be a cause
of an abortion, of which a hemorrhage is the first symptom, and
bearing also in mind the plaintiff's evidence to the effect that the
hemorrhage appeared within approximately twenty-four hours from
the defendant's alleged wrong, we can not say, as a matter of law,

that she did not suffer a physical injury as a result thereof. We are of the opinion that the jury were authorized (though not required) to find that the plaintiff's hemorrhage was a consequence of a physical injury which she had suffered at the time and place claimed, and we conclude, therefore, that the court did not err in submitting to the jury the question of the proximate cause of that condition. See *Georgia R. & B. Co.* v. *Usry,* supra. The miscarriage, however, did not occur until forty days after the defendant's alleged wrongful act. Considering this and the other circumstances, the jury certainly could not have found that the miscarriage was a result of the defendant's negligence, in absence of further evidence of some character. The evidence of the only physician who testified could have aided the jury but little, if any, upon the immediate question for their determination. His evidence shows that the question was one which would be fraught with gravest uncertainty, even in the minds of physicians. Under all the evidence, the cause of the miscarriage was either left hopelessly to conjecture, or the unfortunate happening was attributable to the plaintiff's own conduct. The solution of the question as to the proximate cause of such injury depending upon circumstantial evidence only, the rule as enunciated by this court in *Georgia Ry. & El. Co.* v. *Harris,* 1 *Ga. App.* 714, 717 (57 S. E. 1077), was applicable: "When the party upon whom the burden of an issue rests seeks to carry it, not by direct proof, but by inferences, he has not, in this reasonable sense, submitted any evidence for a jury's decision, until the circumstances he places in proof tend in some proximate degree to establish the conclusion he claims; and for this, the facts shown must not only reasonably support that conclusion, but also render less probable all inconsistent conclusions. The established fundamental rules applicable to circumstantial evidence are the same in civil as in criminal trials. In both cases it is required that the circumstances relied upon be not only consistent with the conclusion sought to be established, but also inconsistent with every other reasonable hypothesis. In civil cases this consistency with the one and inconsistency with the other is required to be established only by a mere preponderance; in criminal cases, to the exclusion of reasonable doubt."

In Patten *v.* Texas & Pac. Ry. Co., 179 U. S. 658 (21 S. Ct. 275, 45 L. ed. 361), the Supreme Court said: "It is not sufficient

for the employee to show that the employer may have been guilty of negligence. The evidence must point to the fact that he was. And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion." While that case was one arising out of the relation of master and servant, the principles therein expressed are applicable in any case where the question in dispute is to be settled by circumstantial evidence. See also *Carroll* v. *Atlanta Paper Co., 7 Ga. App.* 584, 586 (67 S. E. 680); Stone *v.* Crewdson, 44 Wash. 691 (87 Pac. 945); Anton *v.* Chicago &c. Ry. Co., 92 Wash. 305 (159 Pac. 115). Counsel for the plaintiff contend that the defendant should not be allowed to escape damages merely because the probability of the miscarriage may have been enhanced by the plaintiff's trips in an automobile to Atlanta to consult a physician, since these activities by her were rendered necessary by the defendant's negligence. This would assume that the evidence sufficiently fixed the cause upon the defendant except for such activities. But to take the contention as made, the defendant could not be held liable for the consequences of an intervening agency, unless the same should reasonably have been anticipated under ordinary circumstances as the natural and probable result of its own wrongful act. *Wilson* v. *Central of Ga. Ry. Co.,* 132 *Ga.* 215 (1) (63 S. E. 1121). It is very true that if the acts of the plaintiff intervened between the defendant's wrong and the injury suffered, and concurred in producing the injury, the defendant should not thereby be excused, if such intervening acts were the natural result of, or were naturally and reasonably induced by, the antecedent acts of the defendant. *Sparta Oil Mill* v. *Russell,* 6 *Ga. App.* 293 (4) (65 S. E. 37); *Burnett* v. *Rome Ry. & L. Co.,* 7 *Ga. App.* 323 (66 S. E. 803). But it can not be said that the plaintiff's journeys by automobile to Atlanta to consult a physician were the natural result of or reasonably induced by the defendant's negligence. The thing that ordinarily would have happened, and which might have been anticipated, was that the plaintiff would exercise ordinary prudence to get to her home or to some other

reasonably convenient and suitable place, and there, if desired, obtain such proper and necessary medical services as were reasonably within her reach. There is nothing to show that it was necessary for the plaintiff to take the trip to Atlanta, and her going there does not appear to have been the natural result of or to have been reasonably induced by the defendant's negligence. See *Georgia R. &c. Co.* v. *Usry,* supra; *Central of Georgia Ry. Co.* v. *Price,* 106 *Ga.* 176 (32 S. E. 77, 43 L. R.- A. 402, 71 Am. St. Rep. 246). The plaintiff was under the duty of exercising ordinary care to reduce the consequences of the defendant's negligence as far as practicable (Civil Code (1910), § 4398) ; and when we consider her own expert knowledge as to the proper conduct of a woman in her condition, it is well nigh, if not altogether, conclusive that she wholly failed to comply with this duty; but, whether she was negligent or not, if the miscarriage was attributable to her own act as the proximate cause, she could not recover therefor.

"If the damages are only the imaginary or possible result of the tortious act, or other and contingent circumstances preponderate largely in causing the injurious effect, such damages are too remote to be the basis of recovery against the wrong-doer." Civil Code (1910), § 4509. "Damages traceable to the act, but not its legal or material consequence, are too remote and contingent." Civil Code (1910), § 4510. "The negligence complained of must be the main, controlling, and preponderating cause ascertained and distinguished from other causes, in order to be the subject of a recovery." See *Macon* v. *Dykes,* 103 *Ga.* 847, 849 (31 S. E. 443).

In the instant case there were several reasonable hypotheses as to the cause of the injury with which the evidence was not less consistent than with the conclusion sought to be established. It follows that the evidence was insufficient to authorize a finding that the miscarriage was the proximate result of the defendant's negligence, and that the court's charge submitting such question to the jury was unwarranted.

While we have held that the able and learned trial judge committed some errors, there are many other exceptions to excerpts from the court's charge, none of which are subject to the criticisms made of them. We have not deemed it necessary to refer to them in detail. The court erred in overruling the motion for a new trial.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*